IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2025 Session

## STATE OF TENNESSEE v. REGINALD JENKINS

**Appeal from the Criminal Court for Shelby County**
No. 21-00359    James Jones, Jr., Judge

_____

### No. W2024-01215-CCA-R3-CD

_____

Reginal Jenkins, Defendant, appeals from his convictions for two counts of attempted first degree murder and two counts of employing a firearm during a dangerous felony, claiming there was insufficient evidence regarding identity and premeditation. We disagree with Defendant's claims and affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Ashton Jones and Ruchee J. Patel (on appeal); and Eric Mogy and James Davis (at trial), Memphis, Tennessee, for the appellant, Reginald Jenkins.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Chris J. Lareau and John Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Shelby County Grand Jury returned an indictment charging Defendant with two counts of attempted first degree murder, two counts of employing a firearm during a dangerous felony, and three counts of convicted felon in possession of a firearm. The three counts of convicted felon in possession of a firearm were bifurcated, and following a five-day trial, the jury found Defendant guilty of two counts of attempted first degree murder and two counts of employing a firearm during a dangerous felony. After the verdict, Defendant entered a guilty plea to the three counts of convicted felon in possession of a firearm. Following a sentencing hearing, the trial court sentenced Defendant to a total effective sentence of twenty-one years.

**Jury Trial**

Ricky Floyd was the pastor at Pursuit of God Transformation Center ("the church"), in the Frayser neighborhood of Memphis. On the morning of November 16, 2020, Pastor Floyd left his truck and his wife's car at the church with Keith Thomas for cleaning. After Pastor Floyd returned that evening, he and Mr. Thomas left the church in Pastor Floyd's truck to check on rental property owned by the church. They stopped at Watkins Express, a gas station located across the street from the church. While Mr. Thomas pumped gas, Pastor Floyd went inside. During this time, a black SUV pulled up to the gas pumps, and a man exited, took off his jacket, put his jacket in the backseat, reentered the SUV, and then drove away without buying gas or entering the store. When Pastor Floyd exited the gas station, he noticed the man muttering and asked Mr. Thomas if the man spoke to him. Mr. Thomas said the man did not say anything "negative."

As they drove away from the gas station, Pastor Floyd noticed a car following him very closely. Pastor Floyd commented, "Man, that car is on my behind." Pastor Floyd pulled over to let the vehicle pass. Instead, the vehicle pulled beside his truck and an occupant opened fire, with several bullets striking his truck and one round striking Pastor Floyd in the leg. He drove back to his church and called 911. Pastor Floyd could not identify the car and did not know how many people were inside. Mr. Thomas described the vehicle as a black SUV, like a Chevrolet Tahoe.

Memphis Police Department ("MPD") Officer Stanley Dickerson responded to the 911 call. Upon hearing Pastor Floyd's and Mr. Thomas's description of the events, Officer Dickerson issued a "[b]e on the lookout" ("BOLO") for a black Tahoe occupied by an individual "around the 3800 block" of University Street where the shooting occurred. Officer William Watson, an MPD crime scene investigator, went to the church, where he collected a projectile from the floorboard of Pastor Floyd's truck and photographed multiple "gunshot defects" on the driver's side and near the gas tank. Officer Watson took Pastor Floyd's truck into custody as evidence, and MPD Officer Jackson Ngien examined the truck, using a trajectory rod to determine the bullet that caused the defect in the front driver's side door was fired from slightly to the rear of the driver's side of Pastor Floyd's truck.

On the night of the shooting, MPD Sergeant Mario Tate was assigned to investigate the incident. Based on information provided by Pastor Floyd and Mr. Thomas, the following morning, Sergeant Tate went to the scene where the shooting occurred. He interviewed a witness, Johnny Tate, who told Sergeant Tate that, on the prior evening, he heard multiple gunshots and saw a vehicle speeding away from the area. While processing the scene, Sergeant Tate discovered ten 9-millimeter Blazer Luger shell casings in the middle of the intersection.

In an effort to identify the shooter, Sergeant Tate collected surveillance footage from Watkins Express. In the video footage, a black GMC Terrain SUV can be seen pulling up near to where Pastor Floyd's truck was parked at the gas pumps. A man can be seen exiting the GMC Terrain, taking off his jacket, placing the jacket in the backseat, getting back in the vehicle, and then driving away without purchasing gas. Moments later, the same SUV can be seen parking across the street. When Pastor Floyd and Mr. Thomas left the gas station, the GMC Terrain pulled out behind them. From the video, Sergeant Tate was able to obtain the license plate number of the GMC Terrain. After a license plate search, he discovered that the vehicle was registered to Kamillah Baker, whom Sergeant Tate later learned lived with Defendant in Frayser.[1] Sergeant Tate issued a BOLO and obtained a search warrant for the GMC Terrain.

On November 19, 2020, MPD officers seized the GMC Terrain and interviewed Ms. Baker. After being advised of her rights, she identified her GMC Terrain from pictures on Sergeant Tate's smartphone and confirmed that the man seen standing outside of the GMC Terrain was Defendant. A subsequent search of the GMC Terrain uncovered a spent 9-millimeter Blazer Luger shell casing located in the driver's side window cowl. Forensic analysis confirmed that this shell casing was fired from the weapon that fired the ten shell casings recovered at the crime scene.

After calling Ms. Baker as a witness, the State handed Ms. Baker a "still shot" extracted from the surveillance video recorded by "Camera 16" at Watkins Express. Pastor Floyd's gray truck, a red Volkswagen, and a black SUV can be seen parked at the gas pumps; a person can be seen standing on the driver's side of Pastor Floyd's truck; and another person can be seen standing on the driver's side of the black SUV. Ms. Baker testified that she could not identify the black SUV or the individual standing next to the black SUV because the photograph was "blurry." Ms. Baker then acknowledged that she signed a "Waiver of Rights" form and watched "some video footage from the gas station" when she was questioned by Sergeant Tate on November 19, 2020. The following dialogue then occurred:

[THE STATE:] Okay. Were you shown some video footage from a gas station and asked if you recognized anything in that footage?

[MS. BAKER:] Mm-hmm, yes.

[THE STATE:] Okay. Do you remember what your answer was?

---

[1] Defendant and Kamillah Baker were married prior to Defendant's trial. At times in the record, she is referred to as Kamilla Jenkins and Kamillah Baker-Jenkins. Defendant's brief refers to her as Kamillah Baker, and we will refer to her by that name or as Ms. Baker.

[MS. BAKER:] Yes.

[THE STATE:] What was your answer?

[MS. BAKER:] The picture was blurry, so I was telling them that [I] wasn't able to -- I'm not positive. You know, I'm not for sure. So, we just went on questioning, questioning. So, I did state that as my first answer.

[THE STATE:] Okay. Do you remember being asked, "That's the shirt right there?" Your answer, "It looked like it. Yep. Well, it's blurry, but basically, that's what I can tell. It looked just like that."

[MS. BAKER:] Yes.

[THE STATE:] Do you remember that?

[MS. BAKER:] Yes.

[THE STATE:] Do you remember being asked, "That's your truck, right?" And you answered, "Mm-hmm." Question, "Is that Reginald?" Answer, "It is." Question, "It is him?" Answer, "It is him." Do you remember that?

[MS. BAKER:] Well, I don't exactly remember that part, but yes.

[THE STATE:] Okay. Well, let me play it for you. We have it on video.

[MS. BAKER:] Okay.

[THE STATE:] And I'll ask you if you remember that.

[MS. BAKER:] Okay.

At this point, the trial court granted a two-minute recess so that defense counsel and Ms. Baker could watch the ninety-second video of the November 19, 2020 interrogation in the hall while the jury remained in the jury box. The following dialogue then occurred:

[THE STATE:] So, Ms. Baker, from having reviewed, watched the video of your interrogation by the two detectives, did you on three separate occasions say, "It is him."

- 4 -

[MS. BAKER:] Yes, after I stated that it was blurry, but I did say that. I mean, I was tired, scared, confused.

[THE STATE:] When you said it was blurry, that was in relationship to them showing you the picture of a shirt, correct?

[MS. BAKER:] All of the pictures were blurry. Well, they only showed me the truck and pictures at the gas pump.

[THE STATE:] The same pictures I just showed you?

[MS. BAKER:] Yes, the pictures that you showed me when I first got here.

. . . .

[THE STATE:] On November the 19th, you positively identified your husband three times, correct?

[MS. BAKER:] It was blurry. I mean, I've never been to down and testifying and things like that. Going to jail or going to being questioned, so I'm not for sure what was going on or anything. I mean, all of it was just confusing. I'm getting off work, going down there to see what was going on. It was just -- I can't even explain what it was. So, I said it was blurry. For me being questioned and scared, threatened, and I'm going to go to jail. So, it was blurry, and then I did say that was him, but it was most definitely blurry.

[THE STATE:] And later on in that conversation, you said, "It is him." Unprompted from the detectives, you were talking about something else, and you said, "Mm-hmm, I don't know about that, but it is him," didn't you?

[MS. BAKER:] They asked me the same questions.

On cross-examination, Ms. Baker stated that she had never seen Pastor Floyd before trial. She said that she and Defendant lived near Watkins Express and were very familiar with the area. She said that she drove her SUV the day before it was confiscated and did not notice a cartridge casing on her windshield.

The jury found Defendant guilty of two counts of attempted first degree murder and two counts of employing a firearm during a dangerous felony. The trial court denied Defendant's motion for new trial, and Defendant timely appealed.

- 5 -

**Analysis**

Defendant raises two issues on appeal. First, Defendant claims that there was insufficient evidence to identify him as the shooter, and second, Defendant claims there was insufficient proof to show that he acted with premeditation or the intent to kill Mr. Thomas and Pastor Floyd. The State argues that there was "more than sufficient evidence" for any rational trier of fact to find beyond a reasonable doubt that Defendant was the individual who fired into the truck multiple times and shot Pastor Floyd and that there was sufficient circumstantial evidence to show Defendant acted with premeditation. We agree with the State.

*Standard of Review*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

*Criminal Attempt*

Criminal attempt is defined as, when a person "acting with the kind of culpability otherwise required for the offense[,] . . . [a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2020).

### *Premeditated First Degree Murder*

Premeditated first degree murder is, as charged in this case, "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2020). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2020). Premeditation "is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (2020). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

"Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have long recognized that premeditation may be proved by circumstantial evidence . . . and may be inferred from the manner and circumstances of the killing[.]" *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (internal citations and quotation marks omitted). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Our supreme court has discussed that "numerous specific circumstances . . . may bear on the existence of premeditation," including,

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). However, this "list of specific circumstances developed through Tennessee caselaw is not exhaustive," and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)); *see Davidson*, 121 S.W.3d at 615; Tenn. Code Ann. § 39-13-202(e). "Ultimately, then, premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgment." *Reynolds*, 635 S.W.3d at 917 (internal citations and quotation marks omitted).

### *Employing a Firearm During a Dangerous Felony*

Employing a firearm during the commission of or attempt to commit a dangerous felony is a criminal offense. Tenn. Code Ann. § 39-17-1324(b)(2) (2020). A dangerous felony includes attempted first degree murder. Tenn. Code Ann. § 39-17-1324(i)(1)(A) (2020).

### *Identity*

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2022). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id*. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

## *Proof at Trial*

In the light most favorable to the State, the proof at trial established that a black GMC Terrain owned by Ms. Baker, Defendant's then-girlfriend, pulled into Watkins Express, where Mr. Thomas was pumping gas into Pastor Floyd's truck. Video surveillance also showed that, after exiting Watkins Express, the GMC Terrain pulled across the street, waited for Pastor Floyd's truck to leave Watkins Express, and then pulled out behind Pastor Floyd's truck. Pastor Floyd testified that, after leaving Watkins Express, a vehicle began following his truck very closely, so he pulled over to let it pass. Instead of passing, the vehicle pulled beside his truck, and an occupant opened fire, with several bullets striking his truck and one round striking Pastor Floyd in the leg. While processing the scene the morning after the shooting, Sergeant Tate discovered ten 9-millimeter Blazer Luger shell casings in the middle of the intersection. Mr. Tate, a witness who lived near the intersection where the shooting occurred, told Sergeant Tate that he heard multiple gunshots and saw a vehicle speeding away from the area on the night of the shooting. After impounding and searching Ms. Baker's black GMC Terrain, MPD officers found one spent 9-millimeter Blazer Luger shell casing on the driver's side in the front windshield cowl. Expert testimony established that the eleven shell casings were fired from the same weapon.

Three days after the shooting, Ms. Baker was questioned by Sergeant Tate and Sergeant Smith. After viewing a still shot from the Watkins Express surveillance video, Ms. Baker identified the vehicle at Watkins Express as her GMC Terrain and the individual standing beside her vehicle as Defendant. Although Ms. Baker attempted to backtrack on her pretrial identification by claiming at trial that the still shot was "blurry" and that she could not positively identify the black SUV as her GMC Terrain or the individual standing beside her vehicle as Defendant, the jury discredited her testimony in favor of her statement to police, as was its purview. The evidence was sufficient for any rational trier of fact to find beyond a reasonable doubt that Defendant was the individual who fired a weapon from the GMC Terrain. The direct and circumstantial evidence identifying Defendant as the shooter was overwhelming.

Relative to premeditation and Defendant's intent to kill, the circumstantial evidence, including video showing Defendant's pulling the GMC Terrain into Watkins Express near Pastor Floyd's truck, driving out of Watkins Express without getting gas, parking across the street, waiting for Pastor Floyd to leave, and then following Pastor Floyd's vehicle for a short distance before pulling beside Pastor Floyd's vehicle and firing into it ten times, was sufficient for any rational trier of fact to find beyond a reasonable doubt that Defendant acted with premeditation and the intent to kill.

Because the evidence was sufficient to establish that Defendant committed attempted first degree murder by firing a gun into Pastor Floyd's vehicle, the evidence was also more than sufficient for the jury to find beyond a reasonable doubt that Defendant employed a firearm during the commission of a dangerous felony. Defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE